CARR, J.
The only question I shall examine, is, Whether, under the circumstances of this case, Gilliat had any lien on Lynch’s notes pledged by Perkins to Hughes & Arm-istead as a security for the price of the tobacco, for the debt subsequently contracted by Perkins to him individually?
Pvery lien must be the creature of contract either express or implied. In Green v. Farmer, 4 Burr. 2220, lord Mansfield said, “The convenience of commerce and natural justice are in favour of liens; and, therefore, of late years, courts lean that way, 1. where there is an express agreement; 2. where it is implied from the usages of trade; or 3. from the manner of dealing between the parties in the particular case; or 4. where the defendant has acted as a factor.” None of these grounds seem to exist in the case before us : for here was no express agreement, but so far from it, Gilliat admits, that he advanced the money without any agreement with Perkins, for indemnity from the notes; there is no usage of trade even alleged, to justify the claim; there is nothing in the manner of dealing between the parties in this particular case, to shew that Gilliat’s advances were made with an understanding that the notes deposited were to be bound for them; and no factorage in the matter is pretended. The case before lord Mansfield was, I think, quite as strong as that before us: nor does it make any difference, in this respect, that he was deciding a case at law, and we in equity; for the action there was tro-ver, which is an equitable action; and our decision here must be exactly the same as if Perkins, having paid off the debt to Hughes & Armistead for which the notes were deposited, had brought trover against them, or their partner Gilliat, for these notes. The case before lord Mansfield, was this: Heinzleman bought of Green certain goods, which he delivered to Parmer, a dyer, to be dyed on his account; afterwards, H. ^agreed with Green, that he should have his goods back again; G. demanded them of the defendant, the dyer, and offered to pay him for dyeing them ; but the defendant insisted on being also paid a debt due from H. (who had failed) for dyeing other goods, over and above the price of dyeing these. Lord Mans *408 field, after discussing the question with his usual learning and ability, concluded thus: “Here is no factor, no agent, concerned; no transaction but the mere manufacture of dyeing; no course of trade, or general usage, to create a specific lien; no particular circumstances of their method of dealing with H. The very manner of dealing shews they relied on his personal credit. ” And he held, that the defendant had no lien but for the price of dyeing the specific goods. In the course of his argument, he referred to two cases decided by lord Hardwick, ex parte Deeze, 1 Atk. 228, and ex parte Ockenden, Id. 235. The first was the case of a packer, who was allowed to retain cloth for other debts, besides what was due for packing: which, lord Mansfield says, when upon the ground, that by the course of trade, a packer has a lien upon all goods in his hands, being in the nature of a factor. The other case was thus: Matthews, a flour factor, employed Ockenden as his miller, who had considerable dealings with M. in grinding corn for him, on which account M. was generally indebted to O. in a large sum of money, who always had in his hands corn, meal, and sacks of M., sometimes more, sometimes less, but for the most part sufficient to answer the sum due to him; and for this reason, he gave M. a much greater credit than he otherwise would have done, as he always apprehended the corn, meal, and sacks, which he had in his hands, to be a security for the debt due from M. Matthews became á bankrupt, being indebted to O. in a considerable sum due by notes, and also leaving in the hands of O. a large quantity of wheat, some grinding and some ground into flour, with a. great number of sacks, and which O. depended upon as having a security for his debt. The question before lord Hard-wicke, on the petition of O. was,' ^whether he should not be permitted to retain his whole debt out of the wheat, flour and sacks, or only his toll for grinding &c. Lord Hardwicke said, “It lies upon the petitioner to shew, he has any lien, on the corn &c. in his hands; and as to the specific lien he claims, I do not see there is a sufficient reason to consider it as such. In this case, no evidence has been produced of any contract, that the debt which was owing to the petitioner, should be a lien on the corn &c. Nor is there any evidence, that there is any general custom with respect to millers, that it should be a lien. There is then no specific lien, but what Arises from that kind of bailment at law, proceeding from a delivery of goods for a particular purpose, as in the case of a horse standing in the stable of an innkeeper &c.” And after going through the cases on the subject (and among them, Demaindray v. Metcalfe, Prec. in ch. 419, 2 Vern. 691, Gilb. Rep. 104,) he asked, “Suppose the corn factor had tendered the money for grinding the corn, and Mr. Ockenden had refused to deliver it, and he had thereupon brought an action of trover, could O. have set-off the’ antecedent debt? I am clearly of opinion that he could not, and would have had only an allowance pro tanto as was due for grinding the corn. ” The report in Atkins, states that the case was adjourned at the request of the petitioner’s counsel, to the next day of petitions, being an affair of great consequence to trade and creditors in general. Lord Mansfield in Green v. Farmer, says he has a note of the case, and that in December following, no precedents to the contrary being produced, lord Hardwicke decided according to his opinion as reported by Atkins. I consider that a much stronger case than ours; for in that case, there was a course of dealing, during which Ockenden credited Matthews much farther than he would have done, but for the corn &c. generally in his hands, to which he looked for security: yet, as there was no agreement proved, nor general custom shewn, there was no lien. This subject of personal pledges and lien, is very fully examined by the master of the rolls, in Jones v. Smith, 2 Ves. *jr. 372. There, personal securities were pledged for a specific debt; then a mortgage of real estate on a distinct transaction was given to the creditor; and afterwards, the same personal securities (first pledged) with others, were pledged to him for the balance of an account, the question was, whether the personal securities could be redeemed, without discharging what was due for interest on the mortgage? The master of the rolls, in his discussion of the question, first examined the law with respect to tacking, in the case of mortgages-: he considered the cases on the subject, as not satisfactory, and admitted that the present practice has not been always the course. That present practice he stated thus: “Now, at least by the modern cases, it is laid down, that a mortgagee cannot tack a bond against the mortgagor, nor against the creditors, but may against the heir, merely to prevent circuity of action : why not (he asks) against the mortgagor, if the rule is, that where a man, having one security, lends more money to the same party, that person shall pay his whole debt or shall not redeem at all?’’ In support of this position, he referred to the case of Lowthian v. Hasel, 3 Bro. C. C. 162, where lord Thurlow said, “The only reason why the mortgagee can tack his bond to his mortgage, is to prevent a circuit}' of suits: it is solely matter of arrangement for that purpose; for, innatural justice, the right has no foundation. The principle explains the rule; and therefore it can go no further : the creditor having another specific security, cannot give him, in justice, any priority. There being no foundation in justice the only question is, whether the court is in the practice of doing it; and it has not done it in any case, but that of the heir, and merely to prevent circuit}'.’’ Having established this point, the master of the rolls proceeded to cite cases, shewing that where two separate estates are mortgaged (the legal interest being absolutely, and at law irredeemably, conveyed) equity will not interpose in favour of the redemption of one without the redemption of both. He admitted there is no reason for this distinction, as it is impossible to say why a *bond may not be tacked to a mortgage, as well as one mortgage to another; but thus the decisions have settled it. He then took a distinction between *409 a mortgage and a pledge; “a mortgage is a pledge, and more; for it is an absolute pledge, to become an absolute interest, if not redeemed at a certain time: a pledge is a deposit of personal effects, not to be taken back, but on the payment of a certain sum, by express stipulation, or the course of trade, to be a lien upon them.” In the case of a mortgage, the estate is absolute after forfeiture, and at law there is no remedy : equity, therefore, administers relief on its own principles. But, in the case of pledges, whenever the owner pays or tenders the money due, he may bring trover or detinue for the effects deposited; and when such cases come into equity, that court must decide them as a court of law would. In reviewing the cases on this subject, the master of the rolls took particular notice of Demaindray v. Metcalfe, a case mainly relied on in the argument here. This case is differently stated in the several reports of it. In some of them it is simply the case of jewels pawned, and money borrowed on them ; and afterwards two sums of money borrowed by the pawner, for which he gave notes; and the question was, whether his executor (the time for payment being passed) should redeem by paying the money taken up on the pledge, or should be held to pay that also subsequently borrowed? But the case appears to have been thus: Plaintiff for ¿fllO. pawned some jewels to Knight, who signed a writing that they were to be redeemed in twelve months, otherwise, Cor the ^jllO. they were to be bought and sold: Knight, within a short time after, delivered over the jewels together with some plate of his own to Met-calfe, as a pledge for ^200. Knight after-wards borrowed .£38. and £50. of Metcalfe on promissory notes to be paid on demand: and Metcalfe by answer insisted it was agreed, that the pledge should be a security', as well for the money on the notes, as for that first lent; but could make no proof of any promise or agreement.” The chancellor decreed, that the redemption ^'should only be, on paying for all the sums borrowed of Metcalfe, the goods of Knight which were pawned, being first applied. Though the master of the rolls in Jones v. Smith, did not expressly dissent from this decree, it is evident, I think, both from the principles he laid down, and the manner in which he treats the decision, that he disaiJproved of it: he noticed the quaere tamen, annexed by Vernon to the case; and added, that, as reported by him, “it was as near as possible to the case of a mortgage: for a time was limited, viz. a year, when upon default, it was to be absolute;” and he proceeded immediately to cite with approbation, the cases of Green v. Farmer, ex parte Ockenden, Lowthian v. Hasel &c. which, in my mind, expressly overrule the principle of Demaindray v. Metcalfe. He also cited Vanderzee v. Willis, 3 Bro. C. C. 21, where it was decided by lord Thurlow, that bankers having securities deposited for £1000. though the depositer at his death was indebted to them in a larger sum, had no lien further than the £1000. I know that the case of Jones v. Smith is said in 3 Ves. to have been reversed in parliament: but the ground of reversal is no where stated, that I can find. The case is stated as authority in the later books, which treat on that subject, and in the books of general reference. I conclude, therefore, that the reversal was on some point of form or fact, not touching the authority of the case. Again, in ex parte Langston, 17 Ves. 227, lord Eldon lays it down, that if a pledge to secure money were made, and afterwards more money borrowed of the pawnee, and it is made out by his oath uncontradicted, that the subsequent advance was made on an agreement, that the pledge should stand bound for it, this would be supported by the court. In the case before us, Gilliat (the joint pawnee) so far from making oath, that his advance to Perkins was by agreement to be secured on the notes deposited, swears, that there was no such agreement. Ex parte Whitbread, 19 Ves. 208, was the case of a claim by the petitioner, of an equitable mortgage by a deposit of the lease of a public house to secure £1000. *lent to the lessee on his promissory note ; and the petitioner claimed also, a lien on the deposit for £100. subsequently advanced. Lord Eldon said, “When it was determined” (a determination against which he protested, though he felt bound by it) “that an actual deposit was to have the legal effect of an agreement in writing, it was for the money then due, and no more, unless the parol agreement, was also for future sums. If the original bargain did not look to future advances, no subsequent advance can be a charge, unless the subsequent transaction is equivalent to the original transaction. If it is equivalent to a re-delivery of the deed, receiving it back as a security for both sums, that will do; as it cannot depend on that mere form; but I shall require them to swear expressly, that when the sum of ¿£100. was advanced, it was upon the security of the deposit. ’ ’ See also, Mandeville v. Welch, 5 Wheat. 277. From' this review of the cases, it appears to me to be clearly settled, that no lien attached on the notes deposited, for the sum advanced by Gilliat to Perkins.
GREEN, J.
It is affirmed both by Gilliat and by Hughes &■ Armistead, in their answers, that the tobacco sold to Perkins was their joint property, the sale a joint sale, and the notes of Lynch indorsed by him in blank, and deposited in the hands of II. & A. as a collateral security for the purchase money of the tobacco, were so deposited for their joint benefit, and that they were joint holders thereof. And the question is, Whether Gilliat is entitled to satisfaction out of the surplus of Lynch’s rates, after satisfying the balance due at Perkins’s debt to those parties jointly, for a debt due to him individually, contracted by Perkins, partly before and partly after the transaction of the sale of the tobacco and deposit of the notes, without any agreement by Perkins to that effect?
The deposit of Lynch’s notes indorsed in blank, as a collateral security for a debt not equal to their amount, did not give to Gilliat and Hughes & Armistead, an absolute property *in them on account of their negotiable charac *410 ter. On the contrary, they were bound by their contract, jointly, to return the notes, precisely in the form in which they received them, without a re-transfer by their indorsement, if Perkins paid his debt otherwise; or if not, then the surplus money, if they became entitled by his failure to resort to that collateral securitj" for payment, and received its amount, either directly from Lynch, or by discounting his notes with any other; and this joint responsibility arising out of the original contract, could not be rendered several as to Perkins, by any act which they could do without his concurrence, either by one of them only receiving the surplus monejr, and retaining it in his hands, or by indorsing the notes to another in succession, instead of jointly. Por, as to the immediate parties to a negotiable note, and as between an immediate indorser and indorsee, such a note has no peculiar character whatever, distinguishing it from any other contracts, however evidenced. It is open to all objections to the consideration, or want of consideration, and all set-offs and equities between those parties, which would be available in all other contracts not founded on a deed. It is only where a third party acquires an interest by indorsement for full value, that it acquires as to him the character of a negotiable security, entitled to the benefits of the law merchant, against all the other parties except his immediate indorser. These principles are too familiar to require support or illustration by authorities. If, then, Gilliat and Hughes & Armistead, severally or jointly, had received that surplus, and Perkins had brought an action for money had and received against them jointly, they could not have defeated that action, by showing that they did not receive or hold it jointly, but one only had received and held it. And the question is, Whether a debt due from him to one of them could be set-off, in such an action, or pleaded, or given in evidence, as a payment: certainly not as a payment, unless the transaction upon which it arose was intended as a payment; and; in this case, that was impossible ; for when it took place, Perkins *was not in any sense their creditor in respect to Lynch’s notes deposited with them, and could never become so, unless they at the end of four years, should receive from those notes more than they were entitled to retain for his tobacco debt, or such part thereof as he might not pay otherwise; all of which was contingent. And Gilliat made the advance in question, not as a payment in advance of a contingent debt, which might possibly become due to Perkins from him and H. & A. at the end of four years, but upon the express agreement that Perkins should repay it under a bank acceptance at the end of sixty days. Discount is not payment: one is the extinguishment of a debt, by an express payment for that very purpose; the other, by the set-off of mutual debts; but both having the same effect, it has given occasion to the loose expression, that discount is payment, and to our practice under our statutes allowing lawful discounts to be given in evidence under the plea of payment. At the common law, no discount was admitted at law, except in a few special cases, noted by Viner under the head of Discount, in which the mutual liabilities arose from the very same transaction: nor in equity, unless from the nature of the dealings of the parties, or other circumstances, or proofs, an agreement to that effect could be fairly presumed; Downam v. Matthews, Prec. in ch. 580; Jeffs v. Wood, 2 P. Wms. 128; Hawkins v. Freeman, 8 Vin. Discount, A. pl. 26, p. 560, and lord Mansfield’s argument in Green v. Farmer, 4 Burr. 2220. To remedy this, the statute of 4 & 5 Anne, (which was followed by our act of 1706, ch. 34,) and in England, the statutes of 2 & 8 Geo. 2, allowed mutual debts to be discounted, whether the parties had agreed to do so, either expressly or by implication, or not. But neither before nor after the statutes, did the court of equity ever allow a joint debt to be set-off against a separate debt. It could not be done under the statutes, and (as was said by the master of the rolls in Addis v. Knight, 2 Meriv. 121, in which he considered the preceding cases) “it is quite clear, that as at law, a joint cannot be set-off against a ^separate demand, the same rule prevails in equity.’’ The only reported case to the contrary, is that of ex parte quinten, 3 Ves. 248, which is repudiated in ex parte Twogood, 11 Ves. 517. The case of ex parte Stephens, Id. 24, proceeded on the fraud. And the only case here, is that of Dunbar v. Buck et al., 6 Munf. 34, which was founded upon the case of ex parte Quinten, and in which the court allowed, against an individual claim of one partner, unliquidated damages against the partnership to be set-off in equity, even if it should have the effect of calling the partner who was not a party in the cause, and could not be made a party for any other purpose, to settle, in that cause, the whole partnership accounts. This >was contrary to the settled rules, that joint cannot be set-off against separate demands, and that unliquidated damages can in no case be set-off at law, Freeman v. Hyett, 1 W. Black. 394; Howlett v. Strickland, 1 Cowp. 56, and, a fortiori, not im equity, Webster v. Couch, 6 Rand. 519, especially, as a court of equity cannot decree damages against a defendant in any case, Anthony v. Leftwich, 3 Rand. 238, and contrary to the prior cases of Scott v. Trent, 1 Wash. 77, Armistead v. Butler, 1 Hen. & Munf. 176. and Ritchie & Wales v. Moore, 5 Munf. 388, (where, in an action against two upon their note, a debt due by the plaintiff to one of the defendants, as offered was a set-off, and rejected; the precise case at bar, except that this is in equity, that at law) and also to the subsequent case of Porter v. Nekervis, 4 Rand. 359. In Rose v. Murchie, 2 Call, 409, while the court affirmed the same rule, it'held that the payment made to one partner, was in fact made on account of the debt due to the partnership. The debt of Perkins due to Gilliat individually, could not in such an action be used in defence, either as a payment, discount, or set-off; nor could it avail as a defence, in an action of trover by Perkins against them for the I notes, now paid off, except as to the balance *411 due after satisfying the debt for which they were deposited as a pledge, Green v. Farmer, 4 Burr. 2214, nor in a suit in equity, since, if it *were a defence in equity, it would be so at law, either in an action for money had and received, or in trover, which are equitable actions, in which nothing can be recovered that the plaintiff is not ex asquo et bono entitled to claim, and a court of equity must determine such a case as the law would, and decide it exactly as if an action for money had and received or trover had been brought by Perkins against Gilliat and Hughes & Armistead. I adopt the expressions of the> master of the rolls in a similar case, which will be presently more particularly noticed.
The maxim, that he who asks equity must do it to the person of whom he asks it, applies and can be enforced effectually against the plaintiff asking it, only in cases where he is wholly destitute of any legal remedy; as where he has incurred a forfeiture, the effect of which he cannot avoid at law; or made a conveyance, which he cannot impeach in a court of law; or there is a judgment against him, which cannot be reversed. In such cases, he is under a necessity of throwing himself on a court of equity for relief; which is only given by the court, exercising a sound equitable discretion, upon equitable terms. But where a party has a legal right, capable of being effectually asserted at law, and calls for the assistance of a court of equity, because of some serious though not insurmountable difficulty at law, such as the settlement of an account, connected with the necessity of a discovery, or arising out of an equitable trust (as in this case, in respect to the surplus), or upon a collateral ground, such as to prevent an improper disposition of a subject pledged for the security of a debt, by which the rights of the party complaining may be affected (as is this precise case), there, the court can impose no condition upon the mere ground that the party applies to it for relief, and is bound to give that relief according to the legal rights of the parties. To attempt to do otherwise, would be utterly vain as to all the purposes of justice ; for it would only remit the plaintiff to his legal rights, and involve the parties in a new litigation, which must ultimately be determined according to *their legal rights, instead of enforcing them in a cause originally instituted properly in a court of equity. As if, in this case, the court were to hold that no relief should be given to Lynch, unless he would submit to the discount claimed by Gilliat, all it could do would be to dissolve the injunction; and then his defence at law would be perfect. There is no foundation for the court to decree the recovery of any thing against him, unless there be some equitable right in Gilliat, which he could assert as effectually in equity, as plaintiff, as he could as a defendant.
It is insisted, however, that if Gilliat’s individual claim could not be available at law, in any form, against Perkins, yet that it is so in equity, upon the equitable principle, that when one holding a security for an existing debt, makes further advances to the debtor, he cannot reclaim the security, without first satisfj'ing both the old and the new debt; and for this was cited the case of Demaindray v. Metcalfe, which is referred to in several books in an imperfect and confused way, but which may be ascertained from the whole, to have been thus: Demaindray borrowed money from Knight, and pawned jewels, to a much larger value than the money borrowed, as a security for its payment within twelve months, with a stipulation that in case of failure to redeem them, they should be the absolute property of Knight. Knight pawned them immediately, with some of his own plate, to Metcalfe, as security for a loan lo the same amount; and afterwards borrowed of Metcalfe, two other sums, and died insolvent: after the expiration of twelve months, Demaindray having forfeited the property by his failure to pay, or tender what he had borrowed, filed his bill to redeem, upon the ordinary principle of equity relieving against forfeitures, as in case of mortgages of real estate. And the court-held, that he could not redeem, but by paying his own debt to Knight, (which was equivalent to the original debt of Knight to Metcalfe) and also Knight’s debts subsequently contracted to Metcalfe, after first applying the proceeds of the plate pawned by Knight with the jewels. *It is impossible to conceive any reason justifying the imposition of Knight’s debt upon the original owner of the jewels, as a condition upon which alone he was permitted to redeem them, except that, having-forfeited the absolute property at law, he could have no relief but in equity, and there he could only have it upon doing equity lo the defendant, who if he received the jewels from Knight without notice of Demain-dray’s equity, and as the property of Knight, and not otherwise, would he in the situation of a purchaser without notice, to the extent of his demands on Knight: no other case in respect to personal property pledged, upon any terms, has gone farther, or even so far as this; nor has any case ever occurred, in which a. subsequent advance has been held to be a lien upon a prior security for a debt, unless by an agreement to that effect by the debtor, either express, or implied, from the nature or character of the transactions. It was on the principle ot the last mentioned case, that the doctrine of tacking was founded in the case of mortgages; but that was applied only to cases of forfeited mortgages, never to those which were not forfeited; and that doctrine has been restrained by the more modern decisions to a very few cases. All the doctrine upon this subject, particularly in respect to the pledge of personal subjects as security, was very fully examined by the master of the rolls in Jones v. Smith, 2 Ves. jr. 372, in which he came to the conclusion, that, in such cases, subsequent advances cannot be tacked, unless by the agreement of the debtor, and decreed accordingly for the plaintiff, although there was strong ground to contend that there was an express agreement of the parties in writing to that effect. And in ex parte Langston, 17 Ves. 227, lord Eldon laid down the same principle, but allowed, that where the creditor affirmed on oath, that such an agreement was in fact *412 made, and that was supported by the circumstances of the transaction, and not contradicted in any way, it was sufficient proof of such agreement. The decree in Jones v. Smith was reversed in the house of lords, upon the question of fact (I am confident) for as far *as I can ascertain, the case, as it was in the house of lords, has not been reported, I suppose for that reason : and it is still cited as authority upon the questions of law, without noticing the reversal. I conclude confidently, that where personal property is pledged, generally, as a collateral security for a debt, or for any other specific purpose, without any agreement that it shall in any event be absolutely forfeited by the owner, no other lien can be imposed upon it for any other debt or purpose whatsoever, without an agreement to that effect, either express or implied from the nature and circumstances of the transaction; and that such an agreement cannot be inferred from the mere fact that a new liability has been incurred by the owner, especially if the holder claiming such a lien, does not affirm that there was such an agreement, and more especially, if he admits explicitly, that there was none such, as Gilliat does in this case. His declaration that he made the new advance, in the expectation that he would be indemnified out of Lynch’s notes, cannot amount to a contract with Perkins to that effect, nor charge him with such an agreement. It is impossible to imply an agreement from any circumstances, short of positive proof of the fact, against the express admission that there was none; and if that were possible, an examination of the particulars of the transaction, out of which the new debt of Perkins to Gilliat arose, would conclusively negative the inference of any such agreement, and shew that Gilliat really had no such expectation that Lynch’s notes would or could be made a source of indemnity to him, or if he had, that did not, in anjr degree, enter into the motives inducing him to make that advance.
Gilliat, then, has no lien for his individual advances to Perkins, on the notes of Ls’nch deposited by Perkins with Hughes & Armistead and Gilliat, for the single and specific purpose of securing his debt to them for the tobacco he had bought of them; nor has Lj’nch any qualified competitor in this cause, in respect to the balance yet due upon his notes. It is, therefore, unnecessary to make any inquiry as to the *time or manner of his acquiring the notes of Perkins, which he claims to discount against the balance due upon his own notes, or as to the consideration he paid for them. If he holds them, he is entitled against Perkins to their full nominal amount, whenever and however he acquired them,^ and to a set-off accordingly.
But Lynch has exhibited only one of Perkins’s notes, and adduced no proof as to the other; and the one exhibited is not equal to the balance due on his own notes. If he can offer no farther proof, what shall remain of that balance, after discounting them from the contents of the notes of Perkins which he has exhibited, will belong to Hughes & Armistead, as trustees for Perkins.
The decree should, therefore, be reversed, and the cause remanded, with directions to asqertain the aniount of the discounts to which Lynch is entitled; and if they shall not be sufficient to extinguish the balance due upon his own notes, to dissolve the injunction as to the residue, perpetuating it as to the aniount of the discounts established.
CABELL, J.
This case presents the question, how far personal property pledged for the payment of a specific debt, shall be regarded as a security for a debt subsequently contracted?
The case may be simplified, by supposing that Gilliat was the sole creditor of the original debt, for which the pledge was made, as well as in that subsequently contracted; and that this suit had been brought against him, not by Lynch but by Perkins the debtor. This will be to place the case on a footing the most favourable to Gilliat. And I am clearly of opinion, that, even then, it must be decided agaipst him, on principles which have never been departed from, in any english court of law or equity. The principles, on which this branch of the law depends, are most perspicuously laid down by lord Mansfield, in the case of Green v. Farmer. No man, having possession of the property of another, can resist the claim of the owner, either *by set-off or otherwise, merely on the ground that the owner is his debtor. To make such resistance, it is essential that he shall have a lien on the property; and a lien can be acquired only by contract express or implied. There is no difference, in this respect, between a court of law and a court of equity: for a court of equity will not regard any thing as a lien, which would not be regarded as a lien in a court of law also; as the case of ex parte Ockenden and Jones v. Smith, which have been mentioned by my brethren, clearly establish. Then, was there any contract, express or implied, in this case, that the pledged property should be a security for the subsequent debt contracted to Gilliat? Gilliat himself does not pretend that there was any express agreement: he admits there was none. Nor is there any circumstance from which we can imply an agreement, unless we can imply it from the single fact, that Gilliat required a pledge as a security for the first debt, and that he still held this pledge, at the time that he made the subsequent advance. But there never has been a case, in which that circumstance alone was held to amount to an agreement for a lien. Indeed, if that circumstance alone were sufficient, it would have put an end to almost all questions as to liens. In ex parte Whitbread, the lord chancellor said, “if the original bargain did not look to future advances, no subsequent advance can be a charge, unless the subsequent transaction is equivalent to the original transaction;” that is, as he explains himself, it must be “equivalent to a re-delivery of the thing pledged, and receiving it back as a security for both sums.” So far from the circumstances of this case affording ground for implying a lien, they shew that none was intended by the parties. The doctrine, that he who *413 asks equity, must do equity, has no application to a mere pledge of personal property. That doctrine is applied, sometimes, to forfeited mortgages, where the mortgagor brings a bill to redeem: and it is applied then, solely on the ground, that the mortgagee having acquired the legal title by the forfeiture, equity will not take that title from him, until he is paid all that the mortgagor owes him.
*But the decree of the chancellor should be .reversed, for the reason mentioned by judge Green, and corrected as suggested by him.